UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
THE DESIGN PARTNERS, INC.,

                Plaintiff,

      -against-                  **AMENDED MEMORANDUM & ORDER**

                                            12-CV-2949 (PKC)(VMS)

FIVE STAR ELECTRIC CORP.,

                Defendant.
-------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

      Plaintiff The Design Partners, Inc. ("Design Partners"), a computer and design consulting company, commenced this action in June 2012 against Defendant Five Star Electric Corp. ("Five Star"), an electrical contractor, seeking approximately $181,000 in unpaid fees for services rendered between September 2010 and April 2011 in connection with construction projects at Madison Square Garden and the World Trade Center PATH station. Design Partners also seeks damages for Five Star's allegedly improper solicitation and hiring of two Design Partners consultants and breach of a separate contract relating to a computer design training program.

      The parties have each filed partial motions for summary judgment. Design Partners moves for summary judgment on Count 2 (account stated), which is premised on Five Star's alleged failure to timely object to invoices submitted by Design Partners. (Dkt. 54-2 ("Pl.'s MSJ Br.").) Five Star cross-moves for summary judgment on Count 3 (unjust enrichment), Count 4 (intentional interference with the consultants' employment contracts), Count 5 (breach of training program contract), and Count 6 (breach of non-solicitation provision). (Dkt. 52-19 ("Def.'s MSJ Br.").)

      For the reasons set forth below, the Court denies Design Partners' motion for summary judgment on Count 2; Five Star's summary judgment motion is granted as to Count 3 and denied

in all other respects.  In addition, Five Star is directed to show cause within 21 days of the date of this opinion as to why summary judgment should not be granted in favor of Design Partners on Count 5 for breach of the training program contract and on Count 6 for breach of the non-solicitation provision.  *See* Fed. R. Civ. P. 56(f).

## BACKGROUND

The following background represents the parties' version of events based on their 56.1 submissions and the record evidence presented by the parties.[1]  The Court notes that the vast majority of the material facts are not disputed and that most of the issues presented on the parties' cross-motions for summary judgment turn on questions of law.

### I.  Design Partners' Arrangement With Five Star

Design Partners first entered into negotiations with Five Star in August 2010 regarding an agreement to provide Building Information Modeling ("BIM") and Computer-Aided Design Drawing ("CADD") services to Five Star in connection with construction projects at Madison Square Garden and the World Trade Center (the "Projects").  (Def.'s 56.1 ¶ 1.)  Following these discussions, Design Partners' principal, Gautam Gogineni, prepared and submitted a "Consulting Agreement" dated September 1, 2010 to Five Star for its review.  (Def.'s 56.1 ¶ 2.)  The Consulting Agreement itself appears to be a non-project-specific agreement governing the parties' relationship

---

[1] Because the parties have cross-moved for summary judgment, there are four factual statements before the Court:  Plaintiff's 56.1 Statement in Support of Summary Judgment (Dkt. 54-6 ("Pl.'s 56.1")); Defendant's Opposition to Plaintiff's 56.1 Statement in Support of Summary Judgment (Dkt. 56 ("Def.'s 56.1 Opp.")); Defendant's 56.1 Statement in Support of Summary Judgment (Dkt 52-1 ("Def.'s 56.1")); Plaintiff's Opposition to Defendant's 56.1 Statement in Support of Summary Judgment (Dkt. 55-2 ("Pl.'s 56.1 Opp.")).  Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein.  Where relevant, the Court may cite directly to underlying documents.

and is a little over three pages long. (*See* Dkt. 52-9, Marshall Decl. Ex. G.[2]) It incorporates, however, a two-page-long "Engagement Addendum" as Exhibit A, which identifies the services to be provided as "Building Information Modeling" and provides a start date of September 7, 2010 with no end date. (*Id.* ¶ 1.1; *id.* at ECF 6-7.[3]) The Engagement Addendum further provides that Design Partners would invoice Five Star on a monthly basis, and sets forth the following hourly rates for Design Partners' consultants: $105.00 for a partner; $75.00 for a senior associate; $40.00 for a junior associate; and $24.00 for an offshore resource. (*Id.* at ECF 6.)

Although Five Star never signed the Consulting Agreement, Five Star issued a pair of Purchase Orders, both dated October 4, 2010, attaching and incorporating the Consulting Agreement ("10/4/10 Purchase Orders"). (Def.'s 56.1 ¶ 3; Dkt. 52-10, Marshall Decl. Ex. H.) These two Purchase Orders, numbered 9699-00007 and 9722-00001, appear to be substantively identical, except that the first is for the World Trade Center Project and the second is for the Madison Square Garden Project. (Marshall Decl. Ex. H.) The first sentence of each Purchase Order states: "We accept your Proposal (copy attached) for a Consulting Agreement . . ." (*Id.*) A Rider to each Purchase Order packet provides that once accepted by Design Partners, the Purchase Order would "become the exclusive contract between the parties, and all prior representati[ons] or agreements, whether written or oral, not incorporated herein, are superseded." (Def.'s 56.1 ¶ 4; Marshall Decl. Ex. H at Rider A.) Design Partners signed the two Purchase Orders on October 15,

---

[2] Both parties have submitted copies of the Consulting Agreement dated September 1, 2010. Five Star has attached it as Exhibit G to the Declaration of Adam M. Marshall in Support of Defendant's Motion for Partial Summary Judgment (Dkt. 52-2 ("Marshall Decl.")). Design Partners has attached it as parts of Exhibits C and D to the Affidavit of Gautam Gogineni In Opposition to Defendant's Motion for Partial Summary Judgment (Dkt. 55-3 ("Gogineni Opp. Aff.")). For consistency, the Court will refer to Five Star's attachment in this opinion.

[3] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the documents internal pagination.

2010. (Def.'s 56.1 ¶ 5.) Five Star signed them on October 27, 2010. (*See* Marshall Decl. Ex. H.) Design Partners asserts that even though the 10/4/10 Purchase Orders were not formally executed until October, Five Star had voiced acceptance of the Consulting Agreement on September 8, 2010 and work had commenced under the agreement starting on September 9. (Pl.'s 56.1 Opp. ¶ 3.)

The 10/4/10 Purchase Orders, each just over one page long, state that Design Partners was to provide personnel with electrical backgrounds to perform CADD services "in association with the Five Star team for the assigned project." (Marshall Decl. Ex. H ¶¶ 1, 6.) The Purchase Orders provide that these consultants would be responsible for: (i) producing three-dimensional ("3D") drawings from two-dimensional ("2D") project documents and coordinating them with other trades; and (ii) converting the coordinated 3D drawings back into 2D drawings to be used to carry out construction. (*Id.* ¶¶ 2-5.) As described by Design Partners, to perform this work, it "hired independent contractors as consultants and embedded them in Five Star offices to perform [CADD] work under the supervision of Five Star." (Gogineni Opp. Aff. ¶ 3.) The 10/4/10 Purchase Orders set forth the same hourly rates for Design Partners' consultants as the Engagement Addendum. On or about February 4, 2011, Five Star issued additional Project-specific Purchase Orders containing identical terms as the 10/4/10 Purchase Orders, though for different projects. (Def.'s 56.1 ¶ 6; Marshall Decl. Ex. I.)

For the first several months, Five Star paid the invoices that Design Partners submitted. (Gogineni Opp. Aff. ¶ 3.) Between March 2, 2011 and April 28, 2011, however, Design Partners submitted eight invoices to Five Star for CADD services rendered between January and April 2011 that went unpaid. (*See* Pl.'s 56.1 ¶¶ 1-8.) These invoices were for the following amounts:

One invoice on March 2, 2011 for:   $42,900 in wages

Five invoices on April 12, 2011 for:  $16,215 in wages; $225 in expenses

$29,362.50 in wages; $947.70 in expenses

$18,037.50 in wages; $719.30 in expenses

$28,725 in wages; $1,614 in expenses

$24,750 in wages; $1,140.03 in expenses

Two invoices on April 28, 2011 for: $9,450 in wages

$7,500 in wages

These total unpaid balance of these invoices is $181,586.03.[4]  Each of the invoices provide

the number of hours worked by each Design Partners consultant during a particular time period,

which is multiplied by the consultant's hourly rates, along with documentation supporting

expenses incurred (*e.g.*, receipts).  (*See* Dkts. 54-4, 54-5.)  The parties dispute whether Five Star

timely objected to the amounts in the invoices.

## II.    CADD Training Program

Separate and apart from the contracts discussed above, in December 2010, Design Partners

entered into an agreement with Five Star to provide 3D modeling and CADD training to Five Star

employees.  (Def.'s 56.1 ¶¶ 12, 13.)  Although the parties have submitted two different agreements

purporting to govern the training program, the agreements contain identical terms in the same

---

[4] The Court notes that this amount, which it independently calculated based on the numbers listed in Design Partners' 56.1 Statement, (*see* Pl.'s 56.1 ¶¶ 1-8), is $90 higher than the total unpaid balance calculated by Design Partners.  (Pl.'s 56.1 ¶ 9.)  The Court has cross-referenced each of the eight invoice amounts provided in Design Partners' 56.1 Statement against the corresponding invoices submitted by Design Partners.  (*See* Dkts. 54-4, 54-5.)  It finds that the individual invoice amounts listed in the 56.1 Statement are all supported and that the discrepancy appears only in the total.  The Court thus assumes that the $90 discrepancy is due to an arithmetic error on Design Partners' part and will refer instead throughout this opinion to the $181,586.03 figure that the Court has calculated.  Similarly, Five Star's 56.1 opposition contains three minor discrepancies in the individual invoice amounts (amounting to less than $1800) with no explanation.  (*See* Def.'s 56.1 Opp. ¶¶ 2, 6, 8.)  The Court thus assumes these to be clerical errors on Five Star's part.

numbered paragraphs and are therefore undisputed.[5]  In light of the identical terms and numbering, the Court will refer to the agreement in the singular as the "Training Contract."

The Training Contract provides for six-hour-long training sessions to be held on a weekly basis, at a rate of $1,000.00 per session, with Design Partners to provide the trainer, lesson plan, and laptops and Five Star to provide the facilities.  (Training Contract ¶¶ 2, 4, 8.)  The Training Contract provides that the training class "will be limited to a maximum of 6 Five Star personnel (Trainees) who will be dedicated to the training module for a minimum of 12 training sessions and a maximum, if necessary[,] of 26 training sessions (the training module)."  (*Id.* ¶ 3.).  It also provides that "[e]ither party may terminate this Training Agreement after the completion of the first training module for convenience with a 1 month advance notice."  (*Id.* ¶ 5.)  The parties dispute the interpretation of these provisions.

In addition, although the parties agree that training sessions were not held on a weekly basis, they dispute whether that was due to scheduling constraints on the part of the Design Partners trainer or on the part of the Five Star trainees.  (*See* Def.'s 56.1 ¶ 18; Pl.'s 56.1 Opp. ¶ 18.)  In any case, it is undisputed that Five Star discontinued the training program on February 10, 2011, after only four training sessions.  (Def.'s 56.1 ¶¶ 17, 19.)  In an e-mail dated February 10, 2011, Neron Holder of Five Star informed Jared Wyllie of Design Partners that "[s]enior management of Five [S]tar has decided not to continue the training at this time due to schedule issues."  (Marshall Decl. Ex. O.)  The parties do not dispute that Five Star paid in full for the four training sessions that were held.  (Def.'s 56.1 ¶ 20; Pl.'s 56.1 Opp. ¶ 20.)

---

[5] The document submitted by Design Partners is an undated one-page contract entitled "Training for 3D Modeling of Electrical Construction," signed by Gogineni and initialed by Gosal. (Dkt. 55-6, Gogineni Opp. Aff. Ex. T.)  The document submitted by Five Star is a one-page Purchase Order, dated December 3, 2010, which is initialed by Gosal, but not signed by Gogineni. (Dkt. 52-15, Marshall Decl. Ex. M.)

## III. Five Star's Solicitation of Design Partners Consultants

Chris Stailey and Jared Wyllie were two of the Design Partners consultants who were assigned to the Five Star Projects. (Def.'s 56.1 ¶ 8.) Both were hired by Design Partners in September 2010 and began providing CADD services to Five Star shortly thereafter. (Def.'s 56.1 ¶ 8; *see also* Gogineni Opp. Aff. ¶¶ 41, 42.) At the time they were hired, each consultant signed an employment contract with Design Partners containing a non-compete clause, which provided:

> During the period until two (2) years following the termination of your employment for whatever reason . . . [you] shall not . . . provide any software engineering, consulting or programming services to any customer . . . of the Company for which or whose benefit [you] provided services or were associated during your employment with the Company.

(Gogineni Opp. Aff. Ex. N ¶ 5 (Wyllie's employment contract); Ex. O ¶ 4 (Stailey's employment contract).) A separate provision stated that Design Partners "shall be entitled to injunctive relief as well as damages for any violation by [you] of [the non-compete clause]." (*Id.* Ex. N ¶ 8; *id.* Ex. O ¶ 7.) The contracts also provide that Stailey and Wyllie would be compensated at the rate of $15 and $45 per hour, respectively, "which [may] be modified from time to time at [Design Partners'] sole discretion." (*Id.* Ex. N ¶ 3; *id.* Ex. O ¶ 2.)

On or about November 10, 2010, Stailey resigned from Design Partners, purportedly due to a family health emergency. (Def.'s 56.1 ¶ 9; Pl.'s Opp. ¶ 9.) Stailey was hired by Five Star after he left Design Partners. (Pl.'s 56.1 Opp. ¶ 9; Gogineni Opp. Aff. ¶ 41.)[6]

---

[6] Neither party provides evidence regarding the exact period of time within which Stailey was hired by Five Star after leaving Design Partners, but it appears undisputed that it was less than two years. The Court further notes that while Five Star does not expressly admit that it hired Stailey in its 56.1 Statement, Five Star nowhere disputes or otherwise responds to Design Partners' assertion in that regard; indeed, all of Five Star's briefing papers appear to accept the premise that Stailey was hired by Five Star some time following his November 2010 departure.

On or about December 10, 2010, Design Partners prepared a new agreement intended to supersede the Consulting Agreement, known as the Master Services Agreement ("MSA"). (Def.'s 56.1 ¶¶ 22, 23.) The MSA, unlike the Consulting Agreement, included a provision prohibiting Design Partners and Five Star from soliciting or hiring each other's employees. (*Id.* ¶ 24.) The parties dispute whether the MSA was ever executed. (*Id.* ¶ 25; Pl.'s 56.1 Opp. ¶ 25.)

On or about March 28, 2011, Design Partners terminated Wyllie on account of poor performance. (Def.'s 56.1 ¶ 10.) Design Partners contends that it terminated Wyllie in part because it was receiving complaints from Five Star about Wyllie's failure to show up for work on time at Five Star's office and other unprofessional behavior. (Pl.'s 56.1 Opp. ¶ 10.) Five Star hired Wyllie a few weeks after he was terminated from Design Partners. (Def.'s 56.1 ¶ 11.)

## DISCUSSION

### I. Standard of Review

Summary judgment is proper only where, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material within the meaning of Rule 56 where it "might affect the outcome of the suit under the governing law." *Id.* In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and quotation omitted).

This standard imposes the initial burden on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Id.* at 324; *see also Anderson,* 477 U.S. at 256-57. The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [their] version of the events is not wholly fanciful." *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998) (collecting cases). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7,* 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).)

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan,* 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (internal citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001). The Court addresses each of the party's motions in turn.

## II.  Unpaid Invoices For Consulting Services Rendered (Counts 1, 2, 3)

Counts 1, 2, and 3 of the Amended Complaint each seek the recovery of $181,586.03 in unpaid fees for consulting services Design Partners rendered between January and April 2011, under the theories of breach of contract, account stated, and unjust enrichment, respectively. (Dkt. 28 ("Am. Compl.") at ECF 4-5.) Design Partners moves for summary judgment on its claim for

account stated, while Five Star seeks dismissal of the unjust enrichment claim as duplicative. Neither party moves for summary judgment on the breach of contract claim. Finding a genuine issue of material fact to exist, the Court denies Design Partners' motion on its account stated claim; however, the Court grants Five Star's motion and dismisses the unjust enrichment claim.

### A. Account Stated (Count 2)

"An account stated is a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an amount due to the creditor." *United Capital Funding Corp. v. New York City Dep't of Educ.*, 457 F. App'x 53, 54-55 (2d Cir. 2012) (citing Restatement (Second) of Contracts § 282(1) (1981) and 1 N.Y. Jur. 2d Accounts & Accounting § 10 (West 2011)); *see also LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999) (holding that an account stated claim "requires an agreement between the parties to an account based upon prior transactions between them") (citation and quotation marks omitted). To prevail on a claim for account stated, the plaintiff must show that: "(1) an account was presented; (2) it was accepted as correct; and (3) the debtor promised to pay the amount stated." *Kasper Glob. Collection & Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 570 (S.D.N.Y. 2013) (citing *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (quotation omitted)). "The account stated need not necessarily be based on a final statement of account: invoices that are submitted on a regular basis can also create an account stated." *White Diamond Co., Ltd. v. Castco, Inc.*, 436 F. Supp. 2d 615, 624 (S.D.N.Y. 2006) (citations omitted).

Most relevant here, the second and third elements of an account stated claim "may be implied if a 'party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment.'" *Kasper Glob. Collection*, 952 F. Supp. 2d at 570 (quoting *IMG Fragrance Brands*, 679 F. Supp. 2d at 411; *LeBoeuf*, 185 F.3d at 64).

"[T]o defeat a claim for account stated, a client's objection must be timely made and based on the reasonableness of the fees charged." *Nat'l Econ. Research Associates, Inc. v. Purolite C Corp.*, No. 08-cv-7600, 2011 WL 856267, at *3 (S.D.N.Y. Mar. 10, 2011) (citing *Feldman v. Talon Paint Prods.*, No. 01-cv-5657, 2002 WL 31385826, at *5 (S.D.N.Y. Oct. 22, 2002)); *see also DiMare Homestead, Inc. v. Alphas Co. of New York, Inc.*, No. 09-cv-6644, 2012 WL 1155133, at *22 (S.D.N.Y. Apr. 5, 2012) ("Under New York law, 'an account is not agreed to where the defendant has raised an objection to the plaintiff's billings or the quality of the plaintiff['s] work.'").

"[A]n allegation of a timely objection to the account, whether ultimately meritorious or not, will generally defeat a summary judgment motion on an account stated." *Kasper Glob. Collection*, 952 F. Supp. 2d at 570-71 (citing *Premier Steel, Inc. v. Hunterspoint Steel LLC*, No. 10-cv-4206, 2010 WL 5248583, at *3 (S.D.N.Y. Dec. 16, 2010)). "[U]nsubstantiated claims of oral objections" are insufficient, however. *Premier Steel*, 2010 WL 5248583, at *3 (citing *White Diamond Co.*, 436 F. Supp. 2d at 624); *see also Darby & Darby, P.C. v. VSI Int'l Inc.*, 739 N.E.2d 744, 748 (2000) (defendant's "self-serving, bald allegations of oral protests were insufficient to raise a triable issue of fact as to the existence of an account stated"). Rather, to defeat summary judgment, "[t]he party challenging the account must 'raise specific allegations of protest, indicating when, how, and/or to whom objections were made, along with some indication of the content of the conversation(s) had.'" *Premier Steel*, 2010 WL 5248583, at *3 (citation omitted).

While Five Star admits that Design Partners presented it with the eight invoices in question in March and April 2011, Five Star counters that it timely objected to payment on those invoices "following their submission and well before Design Partners filed this action." (*See generally* Def.'s 56.1 Opp. ¶¶ 1-8.) Five Star points to four pieces of evidence in support of this claim. First, Five Star cites to deposition testimony from one of its employees, Nicholas Ciarcia, attesting that

he personally had conversations with Wyllie and Gogineni in which he voiced unspecified "dissatisfaction" with Design Partners' performance. (Dkt. 56-2, Marshall Opp. Decl. Ex. A ("Ciarcia Dep.") 88:1-88:22.) Ciarcia also testified that other Five Star employees discussed these issues with Design Partners and that Five Star's owner specifically informed Design Partners' owners that they would not be paid for their performance. (*Id.* 88:24-89:10, 113:2-22.) Second, Five Star points to a March 21, 2011 e-mail chain between Josh Rattner at Five Star and Gogineni, in which Gogineni disputes Five Star's stated intention to "back charge" Design Partners $4,000, representing the cost to Five Star of reprinting drawings that Design Partners consultants failed to annotate properly. (Dkt. 56-5, Marshall Opp. Decl. Ex. D.) Third, Five Star points to a May 2, 2011 e-mail from Rattner at Five Star, informing Gogineni that "[t]he invoices are being hel[d] up due to sorting out various back charges." (Dkt. 56-4, Marshall Opp. Decl. Ex. C. at ECF 3.) Finally, Five Star points to a letter it received from Design Partners' counsel dated June 6, 2011, stating: "I have been informed that Five Star has objected to making payment due to an alleged failure by Design Partner[s'] staff to insert notes on certain drawings." (Dkt. 56-3, Marshall Opp. Decl. Ex. B.)

The Court notes that none of the above actually contains a direct objection from Five Star to Design Partners regarding any of the invoice amounts. Ciarcia's vague testimony about conversations in which he "voiced dissatisfaction" to Gogineni and Wyllie about Design Partners' performance was not in connection with the invoices. (Ciarcia Dep. 87:19-88:22.) *See also Schulte Roth & Zabel, LLP v. Kassover*, 80 A.D.3d 500, 500 (N.Y. App. Div. 2011) ("Defendant client's occasional oral objections to plaintiff law firm's bills were insufficient to raise an issue of fact as to the existence of an account stated."). The Court finds, moreover, that Ciarcia's similarly

vague testimony about other Five Star employees' conversations with Gogineni, which he admits he was not a part of, is inadmissible hearsay. (*See* Ciarcia Dep. 111:21-113:22.)

Nevertheless, the Court finds that Design Partners' June 6, 2011 letter explicitly acknowledging Five Star's objections to the payment of invoices on account of Design Partners' failure to "insert notes on certain drawings" is sufficient to create genuine issues of material fact as to whether Five Star objected to the invoices. Although Five Star has failed to offer direct evidence of its objection, the Court finds that Design Partners' clear acknowledgment that it received an objection from Five Star sufficiently substantiates Five Star's claim of having made one to survive summary judgment. *Cf. Ruskin, Moscou, Evans, & Faltischek, P.C. v. FGH Realty Credit Corp.*, 228 A.D.2d 294, 295 (N.Y. App. Div. 1996) (finding grant of summary judgment on account stated claim proper where "defendant argued that it had objected to the plaintiff's bills . . . [but] failed to submit any writing, letter, note, documentation or evidentiary proof to support such a claim."). Similarly, viewing all evidence in the light most favorable to the non-moving party, the Court will accept Five Star's argument that the phrase "back charges" refers to "reductions for deficient performance," (Dkt. 56-8 ("Def.'s Opp'n") at ECF 4), and that by informing Design Partners that it was "sorting out various back charges" on May 2, 2011, Five Star may have been "inform[ing] Design Partners that it did not consider the amount billed to be accurate." (*Id.* at ECF 5.)

In its reply, Design Partners argues that the objection referenced in its letter refers specifically to the one $4,000 back charge that is the subject of the March 21, 2011 e-mail—and that Five Star cannot use that one charge as grounds to hold up payment on the remainder of the $181,586.03 owing. However, the Court finds the question surrounding the nature and extent of the "objection" that Design Partners acknowledges receiving—and what the phrase "failure . . . to

insert notes on certain drawings" refers to—to be an issue of fact reserved for the jury.  *See Kasper Glob. Collection*, 952 F. Supp. 2d at 570-71 (a defendant need only show at the summary judgment that it raised a timely objection, even if it is not "ultimately meritorious.").  Accordingly, the Court denies Design Partners' motion for summary judgment.[7]

The Court notes, however, that while Design Partners will be proceeding to trial under both its breach of contract and account stated theories, ultimately, "[d]efendant cannot be found liable on both an account stated claim . . . and a breach of contract claim . . . in connection with the same allegations of a failure to pay monies owed."[8]  *Wachtel & Masyr LLP v. Brand Progression LLC*, No. 11-cv-7398, 2012 WL 523621, at *1 (S.D.N.Y. Feb. 15, 2012).

---

[7] Though denying summary judgment on the basis of a genuine dispute of material fact, the Court rejects Five Star's argument that Design Partners' account stated claim must fail because "an account stated cannot be utilized as another means to collect under a disputed contract." (Def.'s Opp'n at ECF 7 (citing *Simplex Grinnell v. UltimateRealty*, LLC, 38 A.D.3d 600 (N.Y. App. Div. 2007); *Ross v. Sherman*, 57 A.D.3d 758 (N.Y. App. Div. 2008)).  This is not a case where a defendant has, for instance, "established that they had repeatedly disputed the existence of any agreement to pay fees computed on an hourly basis," which inherently calls into dispute any invoices submitted pursuant to that agreement and thus dooms any account stated claim.  *See Erdman Anthony & Associates, Inc. v. Barkstrom*, 298 A.D.2d 981, 982 (N.Y. App. Div. 2002) (citation omitted).  Here, Five Star nowhere challenges the hourly fee structure set forth in the Purchase Orders, which it agrees governs their arrangement.  Thus, the Court finds the instant case to be most analogous to the large body of case law—too many to cite here—in which law firms have established accounts stated by demonstrating that they entered into a retainer agreement with a client and sent him regular invoices pursuant to the agreement, to which the client did not timely object.  *See, e.g.*, *Mintz & Gold LLP v. Daibes*, 125 A.D.3d 488 (N.Y. App. Div. 2015).

[8] The Court notes that some courts in this Circuit have dismissed claims for account stated as duplicative where the plaintiff has also asserted a breach of contract claim.  *See, e.g.*, *Fort Prods., Inc v. Men's Med. Clinic, LLC*, No. 15-cv-00376, 2016 WL 797577, at *4 (S.D.N.Y. Feb. 23, 2016) (dismissing account stated on a motion to dismiss where "the Amended Complaint alleges nearly identical facts for both the breach of contract claim and the account stated claim" and "the damages stated for both claims are identical").  The Court concludes, however, that breach of contract and account stated are two distinct and alternative theories of liability that are premised on two different agreements: here, the underlying Purchase Order, setting forth the hourly fee structure, as distinguished from the agreement to the amount owed under the Purchase Order. *Duane Reade v. Cardinal Health, Inc.*, 21 A.D.3d 269, 269-70 (N.Y. App. Div. 2005) ("An account stated is an agreement, *independent of the underlying agreement*, regarding the amount due on

### B. Unjust Enrichment (Count 3)

Design Partners also seeks to recover the same $181,586.03 in unpaid invoices under a theory of unjust enrichment. The Court grants Five Star's motion for summary judgment on this claim because there are indisputably express contracts governing the same subject matter. *See Cosmocom, Inc. v. Marconi Commc'ns Int'l Ltd.*, 261 F. Supp. 2d 179, 187 (E.D.N.Y. 2003) ("Under New York law, the existence of an express contract between the plaintiff and [defendants] governing the particular subject matter of its claim for unjust enrichment precludes plaintiff from maintaining a cause of action sounding in quasi-contract against [defendants].") (citation omitted); *accord Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987).

As the New York Court of Appeals recently recognized, unjust enrichment "is not a catchall cause of action to be used when others fail." *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (quotations omitted). Rather, it is "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* The parties do not dispute that payment for the CADD services rendered by Design Partners is governed by contract. Whether that contract is the Consulting Agreement, the MSA, the Purchase Orders, or a combination of all of the foregoing, is irrelevant; that there is at least one express agreement that governs the contractual relationship is all that matters. The Court thus finds that Design Partners' unjust enrichment claim is duplicative of its account stated and breach of contract claims to the extent that it seeks recovery of the $181,586.03.

---

past transactions.") (emphasis in original) (citation omitted). Accordingly, the Court will permit Design Partners to establish liability under both alternative theories at trial.

The Court also rejects Design Partners' argument that its unjust enrichment claim encompasses more than just the unpaid CADD services. Design Partners asserts, *inter alia*, that Five Star improperly used Design Partners' consultants for its own business gain to the detriment of Design Partners—including using them to develop Five Star's own in-house CADD abilities by interviewing candidates and training other staff, and to market itself in merger negotiations as a company with CADD capabilities. (Dkt. 55-1 ("Pl.'s Opp'n") at ECF 25-26.) Apart from Gogineni's own statements in his affidavit, however, Design Partners offers no evidence in support of any of these allegations, which are as vague as they are conclusory. Moreover, as they are being asserted for the first time in Design Partners' summary judgment opposition, the Court will disregard Design Partners' new unjust enrichment theory. *See Rojo v. Deutsche Bank,* 487 F. App'x 586, 588-89 (2d Cir. 2012) (a court is "justified" in brushing aside further argument not alleged in complaint but raised for first time in opposition to summary judgment) (citation omitted). Finally, to the extent that Design Partners argues as part of its unjust enrichment claim that Five Star improperly benefitted from the use of laptops provided for training sessions, those damages may be recovered under the Training Contract. *See infra* pp. 22-23.

## III. Breach of Training Contract (Count 5)

Design Partners claims that Five Star breached the Training Contract, which it contends committed Five Star to 26 training sessions at a rate of $1,000 per session, by terminating the training program after only four sessions. Design Partners asserts that Five Star also breached the Training Contract by improperly retaining laptops provided by Design Partners for the training. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citation omitted). Five Star seeks the

16

dismissal of this claim on each of these prongs: Five Star contends that the Training Contract was never signed, that Design Partners failed to adequately perform, that Five Star did not breach the agreement, and that Design Partners suffered no damages. The Court finds Five Star's arguments and supporting facts not only to be unpersuasive, but to militate in favor of a grant of summary judgment on this claim for Design Partners.

### A. Enforceability of Training Contract

Five Star first suggests that the Training Contract is unenforceable because the December 3, 2010 Purchase Order version of the Training Contract was never signed. (Def.'s MSJ Br. at ECF 11 ("As a threshold matter, the 'contract' that Design Partners is seeking to enforce is an unsigned purchase order dated December 3, 2010.").) The Court flatly rejects this argument.

Under New York law, "the existence of a contract may be established through conduct of the parties recognizing the contract," even if no "final contract" has been signed by the parties. *Action Temporaries Mgmt. Co. v. Stratmar Sys., Inc.*, Nos. 95-cv-7698, 95-cv-7754, 1996 WL 110170, at *2 (2d Cir. Mar. 12, 1996) (citing *Apex Oil Co. v. Vanguard Oil & Serv. Co.,* 760 F.2d 417, 422 (2d Cir. 1985) and 21 N.Y. Jur. 2d Contracts § 49 (1982)). "In determining whether the parties' conduct is consistent with the existence of a binding contract, it is necessary that the totality of all acts of the parties, their relationship and their objectives be considered." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg.*, Inc., 487 F.3d 89, 97 (2d Cir. 2007) (citation omitted); *see also, e.g.*, *Bank of Am., N.A. v. Farley*, No. 00-cv-9346, 2002 WL 5586, at *5 (S.D.N.Y. Jan. 2, 2002) ("[B]y acting in accordance with the terms of the agreements, and by performing obligations under those agreements, [the defendant's] actions confirm his participation in an agreement between [the plaintiff] and himself.").

Here, Five Star's conduct leaves no doubt that it understood the Training Contract to be binding and enforceable. Indeed, in support of its own motion for summary judgment, Five Star attaches one e-mail from December 2010 requesting that Design Partners schedule training classes and another from February 2011 informing Design Partners of its intent to discontinue the training program. (*See* Dkt. 52-16, Marshall Decl. Ex. N; Dkt. 52-17, Marshall Decl. Ex. O; *see also* Def.'s 56.1 ¶¶ 12-21.) Five Star moreover states that it participated in four training sessions and paid Design Partners for all four. (Def.'s 56.1 ¶¶ 17, 20.) For Five Star to suggest now that the Training Contract is unenforceable, having behaved to the contrary over the course of two months—and based on a technicality that it was never signed by both parties—borders on frivolousness.[9]

### B. Whether Termination of Training Program Was A Breach

Five Star next argues that even if the Training Contract were enforceable, Five Star did not breach it by terminating the training program after four sessions. Citing to Paragraph 5, Five Star argues that "the [Purchase Order] expressly states that the program may be terminated by either party for convenience, provided the terminating party gives one month's notice." (Def.'s MSJ Br. at ECF 11.) But Five Star glaringly omits a key part of that provision. In full, Paragraph 5 provides that "[e]ither party may terminate this Training Agreement *after the completion of the first training module* for convenience with a 1 month advance notice." (Training Contract ¶ 5 (emphasis added).) Five Star makes no attempt to address what "completion of the first training module" means. The meaning of that phrase, however, is key.

---

[9] The Court additionally notes that while Five Star suggests that no signed version exists, Design Partners attaches a version of the Training Contract that *does* appear to be signed by both parties (though via initials by Mel Gosal). (*See* Gogineni Opp. Aff. Ex. T.) Notably, Five Star does not address Design Partners' proffered version of the Training Contract in its reply, which gives the Court grave concern about whether Five Star sought to deceive the Court by selectively including only an unsigned version of the contract.

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) (citation omitted). "The question of whether the language of a contract is ambiguous is a question of law to be decided by the court," *id.* at 158, where ambiguity is "defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). Where a court determines the contract language to be ambiguous, summary judgment may nevertheless be appropriate where there is "*no* extrinsic evidence bearing on the parties' intentions," *In re Coudert Bros.*, 487 B.R. 375, 390 (S.D.N.Y. 2013) (emphasis in original) (citing *Mellon Bank, N.A. v. United Bank Corp. of N.Y.,* 31 F.3d 113, 116 (2d Cir. 1994), or where there *is* relevant extrinsic evidence, "but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997); *see also Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 131 (S.D.N.Y. 2013).

The Court finds that the termination provision of the Training Contract, permitting either party the right to terminate the Training Program after completion of the "first training module," is unambiguous—but in Design Partners' favor. The phrase "training module" appears in only two other paragraphs of the Training Contract. Paragraph 3 provides that the "training class will be limited to a maximum of 6 Five Star personnel (Trainees) *who will be dedicated to the **training module** for a minimum of 12 training sessions* and a maximum, if necessary[,] of 26 training sessions (the ***training module***)." (Training Contract ¶ 3 (emphasis added)). It is clear to the Court

from this provision that a training *module* consists of a series of 12 to 26 training *sessions*.[10]  This

interpretation is supported by the only other use of the phrase "training module" in Paragraph 9,

which provides that "Design Partners will [] provide Five Star with an evaluation of each trainee's

progress at the 6th Session of any training module."  (*Id.* ¶ 9.)

The only other question for the Court to address is whether the "first training module"

consists of the minimum 12 sessions or, as Design Partners contends, 26 sessions.  Paragraph 3

provides that up to 26 sessions will be held "if necessary."  (Training Contract ¶ 3.)  The Court

finds that the contract language as to this point is ambiguous; however, neither party has submitted

any extrinsic evidence for the Court's consideration.  Design Partners argues that "[a]s the trainer

and the one knowledgeable about CADD and CADD instruction, Design Partners had the

discretion to determine the length of the "module" based on [] [its] evaluation of the progress made

by class attendees."  (Pl.'s Opp'n at ECF 22.)  Five Star, on the other hand, argues that "[g]iven

that the sessions were being held for Five Star's benefit and that it was Five Star [that was] paying

for each session ($1,000.00 each)," the only logical interpretation is that only Five Star had

discretion in determining whether all 26 sessions were necessary.  (Dkt. 60 ("Def.'s Reply") at

ECF 8.)  On this point, the Court agrees with Five Star.  Though it finds Paragraph 3—and indeed,

the entire agreement—to be poorly drafted, the Court finds that the termination provision in

Paragraph 5 would be rendered completely meaningless if Five Star could invoke it only after the

completion of the full 26 training sessions.  Accordingly, the Court concludes as a matter of law

---

[10] Regarding the import of Paragraph 5, Five Star merely asserts, without elaboration, that "[i]f anything, the [Purchase Order for the Training Contract] only purported to require the Five Star *trainees* to dedicate themselves to a minimum of twelve (12) sessions and a maximum of twenty-six (26)."  (Def.'s MSJ Br. at ECF 11 (emphasis in original).)  But the necessary implication of imposing this requirement on Five Star trainees is that Five Star itself was committing to a minimum of 12 training sessions.

that Five Star contractually committed to one training module consisting of 12 training sessions at a rate of $1,000 per session.[11]

### C.  Whether Design Partners Performed

Five Star next argues that Design Partners' breach of contract claim with respect to the Training Contract must fail because Design Partners failed to hold training sessions on a weekly basis as it was obligated to do under the Training Contract.[12]  For its part, Design Partners does not dispute that the training sessions did not meet weekly; it contends, however, that it was *Five Star*'s scheduling issues and not its own that prevented the class from meeting on a weekly basis.

The Court notes that the only two deposition excerpts cited by Five Star, in fact, *support* Design Partners' contention that classes were canceled due to Five Star trainees being unavailable.  (*See* Def.'s MSJ Br. at ECF 12 (citing Dkt. 52-8, Marshall Decl. Ex. F ("Gogineni Dep.") 223:13-19 (attributing any canceled classes to "Five Star's project requirement"), 225:11-24 (noting that the requirement that classes be held weekly "was based on the availability of . . . Five Star trainees").)  Design Partners cites to three additional excerpts of Gogineni's deposition testimony that corroborate the same.  (*See* Gogineni Dep. 228:15-20 ("[I]t's Five Star's scheduling issues, not Design Partners['] scheduling issues."), 229:6-15 ("I can't force [Five Star] to . . . override their priorities . . . . [T]hey were in short supply [of staff], they had to balance their needs."); 228:8-12).  Design Partners also points out that in an e-mail dated February 10, 2011, Five Star informed

---

[11] Because the Court concludes that the "first training module" was not yet completed, and that therefore, Five Star could not invoke the termination provision, the Court need not address whether Five Star provided adequate notice of termination.  (Pl.'s Opp'n at ECF 23.)

[12] Five Star also states in conclusory fashion that the "quality of the training program was also subpar."  (Def.'s MSJ Br. at ECF 12.)  In support of this statement, however, Five Star cites to its own response to Design Partners' interrogatories, which is not admissible evidence.

Design Partners that "[s]enior management of Five Star has decided not to continue training at this time due to schedule issues."[13]  (Dkt. 52-17, Marshall Decl. Ex. O.)  Although it is arguably ambiguous which party was experiencing the "schedule issues," the Court finds that the only reasonable inference to be drawn given the clear weight of the evidence presented—including Five Star's own proffered evidence—is that Five Star was referring to its own scheduling issues in that e-mail.  The Court further notes that Five Star does not respond to this argument at all in its reply.  Thus, in light of the evidence submitted by both parties, the Court finds that there is no factual dispute that Design Partners' failure to hold classes on a weekly basis was due to Five Star's, and not Design Partners', scheduling constraints.

### D.  Whether Design Partners Suffered Damages

Finally, the Court rejects Five Star's argument that Design Partners has failed to establish that it suffered damages because Five Star paid for the four training sessions actually held.  "Under New York law, the normal measure of damages for breach of contract is expectation damages— the amount necessary to put the aggrieved party in as good a position as it would have been had the contract been fully performed."  *Merrill Lynch Capital Servs., Inc. v. UISA Fin.*, No. 09-cv-2324, 2012 WL 1202034, at *22 (S.D.N.Y. Apr. 10, 2012) *aff'd*, 531 F. App'x 141 (2d Cir. 2013); *accord Merrill Lynch & Co. v. Allegheny Energy, Inc.,* 500 F.3d 171, 185 (2d Cir. 2007) ("A party injured by breach of contract is entitled to be placed in the position it would have occupied had the

---

[13] The Court rejects Five Star's argument that Design Partners somehow conceded there was no breach when it failed to object to Five Star's decision to terminate the classes in February 2011 and did not raise one until it commenced this action.  The Court notes that the Training Contract nowhere requires Design Partners to timely object to preserve its rights under the contract and that New York's statute of limitations for contract actions is otherwise six years.  Moreover, that the e-mail phrases the termination in terms of a decision "not to continue training at this time" did not clearly state that Five Star was terminating the program entirely, such that Design Partners can be viewed as having behaved unreasonably by failing to object.

contract been fulfilled according to its terms."); *J & H Holding Co., LLC v. Kloss*, No. 12-cv-05738, 2013 WL 6048815, at *4 (E.D.N.Y. Nov. 13, 2013) ("Under New York law, a plaintiff is entitled to expectation damages, *i.e.*, the loss in value to the plaintiff as a result of the defendant's failure to perform under the agreement") (citing *Casolaro v. Armstrong*, No. 10-cv-4276, 2012 WL 976063, at *5 (E.D.N.Y. Mar. 22, 2012)).

Because the Court determined above that Five Star committed to 12 training sessions at the rate of $1,000 per session, of which it only attended and paid for four, the Court finds that Five Star owes $8,000 under the contract for the additional eight classes it committed to, but did not attend.[14] Design Partners also seeks to recover the depreciation in value of the training laptops that occurred while they were in Five Star's possession. The Court finds that Design Partners may recover that depreciation in value, minus the depreciation in value of the laptops that would have occurred had Five Star attended 12 training sessions—again, the expectation damages. Design Partners must furnish evidence in support of its asserted depreciation in laptop value for trial.

### E. Rule 56(f)

The Court has found that the Training Contract is unambiguous in Design Partners' favor on the meaning of "first training module," and that there appears to be no genuine dispute of material fact that Design Partners performed. Pursuant to Rule 56(f), however, a court may grant summary judgment to a non-moving party only after providing the movant with notice and a reasonable time to respond. *See Hicks & Warren LLC v. Liberty Mut. Ins. Co.*, No. 10-cv-9457, 2011 WL 2436703, at *6 (S.D.N.Y. June 16, 2011). Thus, Five Star is hereby directed to show

---

[14] To the extent that Design Partners seeks to recover the approximately $80,000 worth of hardware, software and labor hours it expended for training, the Court rejects this measure of reliance damages as a matter of law where, as here, expectation damages are certain. *See In re: Residential Capital, LLC*, 533 B.R. 379, 407 (S.D.N.Y. 2015) ("[W]hen expectation damages defy precise calculation, reliance damages are the appropriate remedy.") (citation omitted).

cause within 21 days of the date of this opinion as to why summary judgment should not be granted to Design Partners in the sum of $8,000 on this count.[15]

## IV.    Solicitation And Hiring Of Design Partners Consultants (Counts 4 and 6)

Design Partners claims that shortly after it began placing CADD consultants with Five Star in September 2010, Five Star began soliciting them to leave Design Partners to work directly for Five Star.  The parties do not dispute that one consultant, Stailey, resigned from Design Partners on or about November 10, 2010 and was hired by Five Star at an unspecified date.  The parties also do not dispute that another consultant, Wyllie, was terminated by Design Partners on account of poor performance on or about March 28, 2011 and that he was hired by Five Star soon after. Design Partners does contend, however, that Five Star manufactured complaints about Wyllie's performance in order to induce Design Partners to fire Wyllie.  (Pl.'s 56.1 Opp. ¶ 10.)

Design Partners asserts several distinct causes of action based on Five Star's alleged solicitation and hiring of Stailey and Wyllie.  First, Design Partners claims that Five Star tortiously interfered with Design Partners' employment contracts with Stailey and Wyllie by knowingly inducing them to breach their non-compete clauses (Count 4).  Second, Design Partners claims that Five Star breached the express non-solicitation provision in the MSA as to Wyllie.  (Count 6). Finally, in its summary judgment opposition, Design Partners raises for the very first time a third claim:  breach of the implied covenant of good faith and fair dealing in the Consulting Agreement. Five Star seeks to dismiss both Counts 4 and 6 on summary judgment, and also argues that Design Partners should be precluded from asserting an implied covenant breach at this stage in the litigation.  The Court takes each of these claims in turn.

_____

[15] This judgment would not preclude Design Partners from seeking to recover damages stemming from the depreciation in value of its laptops, as discussed above.

## A. Intentional Interference With Employment Agreements (Count 4)

Design Partners first alleges that Five Star tortiously interfered with Design Partners' employment contracts with Wyllie and Stailey by inducing them to breach the non-compete clauses in their contracts with Design Partners. Those clauses provide: "During the period until two (2) years following the termination of your employment for whatever reason . . . [you] shall not . . . provide any software engineering, consulting or programming services to any customer . . . of [Design Partners'] for which or whose benefit [you] provided services or were associated during your employment with [Design Partners]." (Gogineni Opp. Aff. Ex. N ¶ 5, Ex. O ¶ 4.)

To establish a claim for intentional interference with contract under New York law, a plaintiff must show: "(1) the existence of a valid contract with a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional and improper procuring of a breach; and (4) damages." *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 444 (E.D.N.Y. 2011). Five Star argues first that Wyllie's involuntary termination by Design Partners renders his non-compete clause unenforceable as a matter of law. Five Star also argues that Design Partners cannot establish damages with respect to either Wyllie or Stailey. The Court rejects both arguments.

### 1. Effect of Termination On Enforceability of Non-Compete Clause

Five Star first argues that "New York courts will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated," citing to *SIFCO Indus., Inc. v. Advanced Plating Techs., Inc.*, 867 F. Supp. 155, 158 (S.D.N.Y. 1994). The Court finds, however, that Five Star ignores a key distinction with respect to that case: *SIFCO* was referring to terminations *without cause*. In *SIFCO*, the court held that an employer could not enforce a non-compete provision against former employees where the employees were involuntarily laid off after a plant closing. *SIFCO* relied on the New York Court of Appeals's

holding in *Post v. Merrill Lynch*, 397 N.E.2d 358, 360 (N.Y. 1979), which similarly, by its own wording, was limited to cases involving termination *without* cause. *See Post*, 397 N.E.2d at 361 ("Where the employer terminates the employment relationship *without cause* . . . his action necessarily destroys the mutuality of obligation on which the covenant rests . . .") (emphasis added); *see also Cray v. Nationwide Mut. Ins. Co.*, 136 F. Supp. 2d 171, 178-79 (W.D.N.Y. 2001); *In re UFG Int'l, Inc.*, 225 B.R. 51, 55 (S.D.N.Y. 1998) ("[A]n employee's otherwise enforceable restrictive covenant is unenforceable if the employee has been terminated involuntarily, *unless the termination is for cause*.") (emphasis added); *accord Stanacard, LLC v. Rubard, LLC*, No. 12-cv-5176, 2016 WL 462508, at *23 (S.D.N.Y. Feb. 3, 2016) (denying summary judgment where there was a question of fact as to whether employee was terminated for cause, in which case non-compete clause would be enforceable against employee) (citing *UFG*, 225 B.R. at 55 and *Post*, 397 N.E.2d at 36).

The reasoning of *SIFCO* and *Post* relies specifically on the unfairness of a scenario in which the employees against whom non-compete covenants are sought to be enforced have done nothing to bring about their own discharge. *See Gismondi, Paglia, Sherling, M.D., P.C. v. Franco*, 104 F. Supp. 2d 223, 234 (S.D.N.Y. 2000), *order vacated in part on other grounds*, 206 F. Supp. 2d 597 (S.D.N.Y. 2002). Put differently, where—through no fault of the party covenanting not to compete—the employer is no longer willing to employ that party, *Post* stands for the proposition that it would be unfair for the employer to turn around and enforce the non-compete clause against that party. As the *SIFCO* court noted, "[a]n essential aspect [of enforceable restraints on employee mobility] is the employer's *continued willingness to employ* the party covenanting not to compete." 867 F. Supp. at 158 (quoting *Post*, 397 N.E.2d at 360) (emphasis added).

This reasoning is inapplicable when a termination is for cause. The Court finds *Gismondi*, 104 F. Supp. 2d 223, to be particularly persuasive here. In *Gismondi*, the court held that the termination of an employee for cause does not preclude the enforcement of the non-compete provision against him, because to hold otherwise would be to permit employees to avoid reasonable non-compete agreements simply by "creating" cause for their dismissal. *Id.* at 234. Indeed, the terminated employee in *Gismondi* was alleged to have "maneuvered his employer into terminating him so he could wiggle out from under the covenant not to compete," *id.*, which is precisely the allegation Design Partners asserts here. The Court agrees with the reasoning in *Gismondi* and holds that Wyllie's termination for cause does not render the non-compete clause in his employment contract with Design Partners unenforceable.[16]

---

[16] Although Five Star does not dispute the validity of the restrictive covenant in the first instance, the Court observes that Design Partners' business interest here—protecting itself from "disintermediation" (which one court has described as "a twenty-dollar word meaning to cut out the middleman")—does not fall neatly into any of the limited categories of legitimate interests recognized by New York courts as justifying a restrictive covenant. *Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc.*, 946 F. Supp. 495, 502 (E.D. Ky. 1996) *aff'd*, 156 F.3d 1228 (6th Cir. 1998); *Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13-cv-8739, 2014 WL 97317, at *8 (S.D.N.Y. Jan. 9, 2014) (listing four categories of legitimate interests under New York law). Whether protection from disintermediation can be a legitimate interest justifying a non-compete covenant appears to be a matter of first impression in this state and Circuit. The Court notes that several other jurisdictions have recognized such an interest, most notably, in the seminal case of *Consultants & Designers, Inc. v. Butler Service Group, Inc.*, 720 F.2d 1553 (11th Cir. 1983). *See also HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 172 (3d Cir. 2015); *Borg-Warner*, 946 F. Supp. 495. In *Consultants & Designers*, which involve facts very similar to the case at hand, the court offers a well-reasoned and persuasive defense of the middleman, reasoning that restrictive covenants prevent the "opportunistic appropriation" of its work product without payment for the full value of its services. 720 F.2d at 1559.

In the absence of any dispute or briefing by the parties as to the validity of the clause, however, the Court declines to decide today the circumstances under which New York courts would recognize protection from disintermediation as a legitimate interest. The Court is satisfied that in this particular case, which involves alleged wrongdoing by one sophisticated business entity against another, the "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood" are not implicated to the same extent as where an employer seeks to enforce a restrictive covenant against an employee. *Calico Cottage, Inc. v. TNB, Inc.*, No. 11-cv-0336, 2014 WL 4828774, at *5 (E.D.N.Y. Sept. 29, 2014).

## 2. Design Partners' Ability To Prove Damages

Five Star's second argument is that Design Partners' tortious interference claim must fail because Design Partners cannot prove "it was damaged as a result of" Five Star's solicitation and hiring of Stailey and Wyllie.[17]  (Def.'s MSJ Br. at ECF 10.)  Specifically, Five Star argues that Gogineni was unable to put a specific dollar value on damages at his deposition and "was only able to make vague references to two (2) projects that Design Partners supposedly had to pass up or turn down." (*Id.*)  Five Star also argues that Design Partners has failed to identify an economic expert who can testify as to its damages.  In response, Design Partners asserts that "the measure of damages is going to [] be the number of years (or part thereof) that those employees have worked at Five Star multiplied by 2000 hours per year, times the hourly rates that Design Partners charged for their services under the contracts to provide CADD to Five Star."  (Pl.'s Opp'n at ECF 21.)  Design Partners cites no facts or law in support of this measure of damages.

The Second Circuit recognizes different standards of proof depending on the type of damages a plaintiff seeks.  "General damages are the natural and probable consequence of the breach of a contract."[18]  *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680

---

[17] The Court construes Five Star's argument to be that Design Partners will be unable to establish damages with sufficient certainty, rather than that Design Partners suffered no damages, which would be a specious argument.  *See Tractebel*, 487 F.3d at 110 ("[W]hen it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain.") (citing *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 266 (N.Y. 1886)).

[18] The Court notes that here, the damages for a tortious interference claim are linked to the damages for a breach of the underlying contract.  Under New York law, a plaintiff in a tortious interference with contract case is entitled to damages in the amount of the full pecuniary loss of the benefits of the contract.  *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996) (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 197 n.6 (1980)).  Similarly, "the measure of damages for a violation of a restrictive covenant is the loss sustained

(N.Y. 2014) (quotation marks and citation omitted). By contrast, consequential damages "result when the non-breaching party's ability to profit from related transactions is hindered by the breach." *Carco Grp., Inc. v. Maconachy*, 383 F. App'x 73, 75 (2d Cir. 2010); *accord Tractebel*, 487 F.3d at 109. Lost profits may fall into either category. *Tractebel*, 487 F.3d at 109. While a party claiming consequential damages must prove the amount of damage with "reasonable certainty," *Kenford Co. v. Erie Cty.*, 493 N.E.2d 234, 235 (1986), a party claiming general damages "need only provide a 'stable foundation for a reasonable estimate [of damages].'" *Tractebel*, 487 F.3d 89 at 111 (citing *Freund v. Washington Square Press, Inc.*, 314 N.E.2d 419, 421 (N.Y. 1974)).

Applying these principles, the Court finds that profits diverted from Design Partners as a direct result of Stailey's and Wyllie's switch to Five Star constitute general damages, but that profits attributable to other business opportunities lost by Design Partners as a result of Stailey's and Wyllie's switch are consequential in nature. While the Court will permit Design Partners to proceed to trial on general damages, the Court finds that Design Partners has failed to point to any facts supporting a claim for consequential damages. *See Conte v. Cty. of Nassau*, No. 06-cv-4746, 2015 WL 1529787, at *6 (E.D.N.Y. Apr. 2, 2015) ("To recover [consequential] lost profits, a plaintiff must 'establish both the existence and amount of such damages with reasonable certainty,' before the damages issue is even submitted to the jury.") (citing *Schonfeld v. Hilliard,* 218 F.3d 164, 172 (2d Cir. 2000) (citation omitted)).

Furthermore, with respect to general damages, the Court modifies the measure of damages proposed by Design Partners, and instead finds that Design Partners' damages are comprised of

---

by reason of the breach, including 'the net profits of which the plaintiff was deprived' by the defendant's acts." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 519 (S.D.N.Y. 2011) (quoting *Weinrauch v. Kashkin,* 64 A.D.2d 897, 898 (N.Y. App. Div. 1978)).

the actual hours of "software engineering, consulting or programming services" that Stailey and Wyllie performed for Five Star after they left Design Partners, multiplied by the hourly rate that Design Partners had charged Five Star for Stailey's and Wyllie's work, respectively, less what would have been Design Partners' cost of employing Stailey and Wyllie for that period of time. The amount of lost profits recoverable by Design Partners, moreover, are appropriately capped at two years, since the non-compete clause only restricted Stailey and Wyllie from working for Five Star for two years after they left Design Partners. The Court finds that this measure represents the net profits lost—*i.e.*, diverted away from Design Partners—as a direct result of Five Star's interference with Stailey's and Wyllie's employment agreements.[19]

### 3. Five Star's Knowledge of Non-Compete Clauses In Wyllie's and Stailey's Employment Agreements And Improper Procurement of Breach

Five Star does not address the second and third elements of a claim for intentional interference with an employment contract. Accordingly, this claim will proceed to trial to determine whether Five Star was aware of the non-compete clauses in Stailey's and Wyllie's respective employment contracts, and whether Five Star intentionally procured a breach thereof.

---

[19] In response to Five Star's damages argument, Design Partners also states, in conclusory fashion, that "[a]ny punitive damages will be assessed by the jury based on the facts presented at trial – and similarly does not require expert testimony." (Pl.'s Opp'n at ECF 21.) The Court has doubts as to whether punitive damages may be sought in this case. *See, e.g.*, *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 239 (S.D.N.Y. 2013) (finding punitive damages to be "limited to the most egregious of cases" and finding the plaintiff "at most . . . suffered the ill effects of several business torts, which can be remedied by compensatory damages"); *Barbagallo*, 820 F. Supp. 2d at 449 (dismissing punitive damages claim at motion to dismiss stage where the plaintiff was asserting claims for tortious interference with contract, misappropriation of trade secrets, and breach of fiduciary duty). However, because neither party has briefed this issue, the Court declines at this time to address the issue of whether Design Partners may pursue punitive damages at trial.

## B. Breach of Non-Solicitation Provision (Count 6)

In addition to its intentional interference claim, Design Partners contends that Five Star breached the MSA's express non-solicitation provision when it hired Wyllie in April 2011.[20]  Both parties agree that Paragraph 7 of the MSA expressly prohibits solicitation or employment by either party of the other's employees "during the term of this Agreement and within one year after termination thereof" without prior written consent of the other party.  (Dkt. 51-12, Marshall Decl. Ex. J ¶ 7.)  Five Star moves for summary judgment on the ground that the MSA was never signed, which it argues renders it unenforceable.  Design Partners counters that, although Five Star never signed the MSA, Five Star expressly agreed to the MSA in a series of Purchase Orders, each of which had attached to it the MSA.  In support of this argument, Design Partners submits "true and correct" copies of six Purchase Order packets issued and signed by Five Star on or about March 1, 2011 and mailed to Design Partners, along with the manila envelope they came in.  (Gogineni Opp. Aff. ¶¶ 53, 54; *id.* Exs. G-M.)  Each of these Purchase Orders issued by Five Star states, "We accept your Proposal (copy attached) for a Consulting Agreement . . . ." and attaches the MSA. (Gogineni Opp. Aff. ¶ 54; *id.* Exs. G-M.)  Design Partners argues that the MSA was incorporated by these Purchase Orders, and thus, executed and enforceable.  Five Star does not contest the authenticity of these documents or otherwise address Design Partners' argument in its reply.[21]

---

[20] Design Partners appears to concede that the MSA did not cover Five Star's solicitation and hiring of Stailey, which occurred before the MSA went into effect on December 10, 2010. (Pl.'s Opp'n at ECF 17.)

[21] The Court notes that Five Star's proffered versions of these Purchase Orders do not include the MSA as an attachment.  (*See* Marshall Decl. ¶ 11, Ex. I.)  The Court is concerned that this was yet another instance of selective inclusion of the evidence by Five Star for the purpose of misrepresenting the facts to the Court.  *See supra* n.9.

Five Star's sole argument is that it never signed the MSA, thereby rendering it unenforceable. According to Five Star, "Paragraph 9 of the MSA unambiguously provides that the agreement is not effective until it is signed by both parties." (Def.'s MSJ Br. at ECF 13.) Five Star, however, overstates the import of that paragraph, which states: "This Agreement shall be effective when signed by both parties . . ." (Dkt. 52-12, Marshall Decl. Ex. J ¶ 9.) The Court finds that this paragraph falls short of expressly or unambiguously providing that "the parties . . . intended to be bound *only* upon [the] signature of the agreement by both parties." *Newby v. News Mkt., Inc.*, 170 F. App'x 204, 206 (2d Cir. 2006) (emphasis added). Rather, the import of Paragraph 9 is that signing is *one* way to execute the agreement, but not necessarily the *only* way.

This interpretation is consistent with Five Star's own conduct. In each of the Purchase Orders Five Star sent to Design Partners on March 1, 2011, each with the MSA attached, Five Star expressly stated that it "accept[ed] [Design Partners'] Proposal (copy attached)." Five Star's conduct not only demonstrated the parties' intent *not* to make the signing of the MSA the sole means by which the agreement could become effective, it also clearly demonstrated Five Star's acceptance and execution of the MSA as part of its contract with Design Partners, forming the basis of all Purchase Orders to which it was attached. *Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 589 n.66 (S.D.N.Y. 2005) (it is well-established under New York law that "a contract may incorporate another document by making clear reference to it and describing it in such terms that its identity may be ascertained beyond doubt") (quoting *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG,* 121 F.3d 24, 30 (2d Cir. 1997)).

Further buttressing this conclusion is Gogineni's statement that Five Star told him at a December 10, 2010 meeting that it was accepting the MSA and had asked Design Partners to begin performance under the MSA. (Gogineni Opp. Aff. ¶¶ 51, 52.) Design Partners also asserts that

the manner in which Five Star accepted the MSA was entirely consistent with the manner in which Five Star accepted the Consulting Agreement, the validity of which Five Star does not dispute, despite it also not having been signed. (*See* Def.'s 56.1 ¶¶ 2-5.) Again, Five Star does not address either Gogineni's testimony or this argument in its reply. The Court finds both persuasive. Accordingly, the Court finds that by issuing and signing Purchase Orders that attached the MSA, with the words "[w]e accept your Proposal (copy attached)," Five Star clearly executed the MSA, and that the non-solicitation provision in that agreement is enforceable by Design Partners.

The parties do not dispute that Five Star employed Wyllie a few weeks after his departure from Design Partners. (Def.'s 56.1 ¶¶ 10, 11.) The Court finds that this is in clear breach of the terms of the MSA non-solicitation clause, which provided that Five Star "shall not, directly or indirectly, *employ or engage or solicit employment or engagement of* any employee or consultant of [Design Partners] during the term of this Agreement and within one year after termination thereof." (Marshall Decl. Ex. J ¶ 7 (emphasis added).) Finding no genuine dispute of material fact remaining for trial regarding Five Star's breach of the non-solicitation provision of the MSA with respect to Wyllie, the Court directs Five Star to show cause within 21 days as to why summary judgment should not be granted, pursuant to Rule 56(f), in favor of Design Partners on Count 6 as to Five Star's employment of Wyllie.

### C. Breach of Consulting Agreement's Implied Covenant

Acknowledging that its claim for breach of the MSA would apply only to Wyllie and not Stailey, Design Partners argues, for the first time in its opposition to summary judgment, that Five Star breached the implied covenant of good faith and fair dealing in the Consulting Agreement with respect to Stailey. Five Star counters that Design Partners should be precluded from asserting

this theory for the first time in its opposition to summary judgment. For the reasons below, the Court will permit Design Partners to raise this claim at this stage and to proceed to trial on it.

### 1. Whether Design Partners Should Be Permitted To Assert A New Theory

It is well-established that a party "generally may not assert a cause of action for the first time in response to a summary judgment motion." *Henry v. Metro. Transp. Auth.*, No. 07-cv-3561, 2014 WL 4783014, at *10 (S.D.N.Y. Sept. 25, 2014) (citation and quotation omitted); *Malmsteen*, 940 F. Supp. 2d at 135 ("Because [Plaintiff] failed to include this claim in his Amended Complaint, instead raising it for the first time in opposition to summary judgment, it is waived.") (citing *Rojo*, 487 F. App'x at 588–89). "Under Fed. R. Civ. P. 15(b), however, a district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice." *Henry*, 2014 WL 4783014, at *10 (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569 (2d Cir. 2000)). Thus, in contrast to claims that are "entirely new," claims that are "related to or are mere variations of previously pleaded claims—that is, claims based on the same nucleus of operative facts and similar legal theories as the original claims—may be raised on a motion for summary judgment where the defendant was clearly on notice from the complaint and was not unfairly prejudiced." *Id.* (citation and quotation omitted).

The Court agrees with Five Star that Design Partners' theory was not raised in the Amended Complaint, notwithstanding Design Partners' attempt in its opposition to shoehorn it into Count 6. Count 6 of the Amended Complaint refers throughout to a single agreement that "expressly prohibited" Five Star's solicitation of Design Partners' employees. (Am. Compl. ¶¶ 59-65.) The Court finds this to be a clear reference to the MSA, and not the Consulting Agreement. Although one paragraph in Count 6 alleges that Five Star also breached the covenant of good faith and fair dealing "contained in the parties' agreement," this agreement is also fairly construed to refer to the

MSA.  (*Id.* ¶ 65.)  Similarly, the pre-motion conference letter response submitted by Design Partners on August 24, 2014 discusses Count 6 solely with reference to the MSA.  (Dkt. 24 at ECF 3-4.).  The Court notes, moreover, that this theory could have been asserted at the time of the Amended Complaint; Design Partners points to no new facts that have come to light in discovery that supports the addition of such a theory only now, at this late stage.

Nevertheless, the Court will permit Design Partners to assert a theory of breach based on the implied covenant of good faith and fair dealing, because it finds the prejudice to Five Star to be minimal.  Indeed, Five Star does not provide any examples of how it would be prejudiced in its reply to Design Partners' opposition.  *See Cruz*, 202 F.3d at 569 ("In opposing a Rule 15(b) amendment, 'a party cannot normally show that it suffered prejudice simply because of a change in its opponent's legal theory.  Instead, a party's failure to plead an issue it later presented must have disadvantaged its opponent in presenting its case.'") (quoting *N.Y. State Elec. & Gas Corp. v. Secretary of Labor*, 88 F.3d 98, 104 (2d Cir. 1996)).  The Court notes that the alleged breaching activity—Five Star's solicitation and hiring of Wyllie and Stailey—is the same with respect to both breach of contract theories.  The parties have presumably engaged in ample discovery regarding the nature of Five Star's communications with Stailey and Wyllie, in connection not just with the breach of the MSA provision in Count 6, but also the intentional interference claims in Count 4.  Five Star certainly does not contend otherwise.

## 2.  Viability of Implied Covenant Theory

In addition to the express terms of a contract, New York law implies in every contract a covenant of good faith and fair dealing "pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006)

(quoting *M/A–COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)); *see also Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 180-81 (S.D.N.Y. 2007). In assessing the existence of an implied covenant, "[t]he boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989). One New York court has formulated the standard as follows: "Implied promises are recognized when either the promises are so clearly within the contemplation of the parties that it is unnecessary to express them, or when the promises are beyond the thought of the parties but necessary to effectuate the purpose of the contract." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 285 A.D.2d 244, 247 (N.Y. App. Div. 2001) *aff'd in part*, 773 N.E.2d 496 (2002) (citations omitted).

However, the covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract . . . . It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–99 (2d Cir. 2005) (quotation and citation omitted); *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 407 (E.D.N.Y. 2012) ("While independent obligations beyond those stated in the contract will not be inferred, a plaintiff adequately states an implied covenant claim by alleging conduct that subverts the contract's purpose without violating its express terms.") (citing *JPMorgan Chase Bank, N.A. v. IDW Group, LLC,* No. 08-cv-9116, 2009 WL 321222, at *7 (S.D.N.Y. Feb. 9, 2009)); *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 292 (N.Y. 1995) ("no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'") (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)). A court may also not construe the covenant to "undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *Galesi,* 904 F.2d at 136

(quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 281 N.E.2d 142, 145 (N.Y. 1972)).

The Court finds that the Consulting Agreement can fairly be read to encompass an implied covenant of good faith and fair dealing to refrain from poaching the very consultants that Five Star contracted with Design Partners to provide. Here, Five Star has not contracted with Design Partners to provide recruitment or headhunting services, whereby Design Partners would receive some finder's fee for its efforts to locate and provide qualified consultants. Rather, Design Partners earns its income by employing the consultants themselves, placing them with clients, and charging clients a price per consultant that exceeds what it must in turn pay the consultant. *See Consultants & Designers*, 720 F.2d at 1555. For Five Star to immediately hire away the consultants Design Partners places with it, cutting out the middle man, would "subvert[] the contract's purpose without violating its express terms," *JPMorgan Chase*, 2009 WL 321222, at *7, and deprive Design Partners of the fruits of the contract. The Court further finds as a matter of law that such a covenant would not conflict with the other terms of the Consulting Agreement.[22]

The Court rejects Five Star's argument that the presence of a merger clause in the Consulting Agreement prevents the Court from inferring any obligations not stated in the

---

[22] Five Star argues that the presence of a non-solicitation provision running one way from Five Star to Design Partners in the Consulting Agreement raises an inference that a non-solicitation provision running in the other direction was intentionally excluded from the contract. The Court notes first that this provision appears, not in the Consulting Agreement or Engagement Addendum drafted and presented by Gogineni to Five Star, but in the accompanying Exhibit B to the Consulting Agreement, which appears to be a standard intellectual property agreement supplied by Five Star. (*See* Marshall Decl. Ex. G at ECF 9.) The Court further notes that the doctrine of *expressio unius*, the express mention of one thing excludes all others, is not absolute. *See Thomas v. Price*, 631 F. Supp. 114, 122 (S.D.N.Y. 1996) (refusing to apply maxim because it "should not be applied to defeat contractual intent that is otherwise manifest"). Under the circumstances presented here, the Court finds that reading the proposed implied covenant of good faith and fair dealing into the Consulting Agreement would not be inconsistent with its other terms.

Agreement. As a general rule, "if a contract recites that all of the parties' agreements are merged in the written document, parol evidence is not admissible to vary, or permit escape from the terms of the integrated contract." *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993). However, as long as the implied term is consistent with other terms in the contract, "a merger clause does not prevent a court from inferring a covenant of good faith and fair dealing." *SNS Bank, N.V. v. Citibank*, N.A., 7 A.D.3d 352, 354–55 (N.Y. App. Div. 2004).

The Court also rejects Five Star's argument that Design Partners may not pursue an implied covenant claim concurrently with a claim for breach of an express contract provision arising from the same facts, referring to the Design Partners' MSA breach claim. Five Star misapprehends the law. A claim for breach of the implied covenant is only duplicative if the conduct allegedly violating the implied covenant is also the predicate for an express breach *of the same underlying contract*; this is because the "covenant of good faith and fair dealing is not [considered] distinct from the underlying contract." *Alter v. Bogoricin*, No. 97-cv-0662, 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 2007); *see also J.P. Morgan Chase*, 2009 WL 321222, at *5 & n.2. Here, because Design Partners' breach of an implied covenant claim with respect to Stailey is based on the Consulting Agreement, it is not duplicative of its breach of contract claim with respect to Wyllie, which is based on the MSA.

Thus, the Court is allowing Design Partners to proceed on an implied covenant theory as to Wyllie and will allow this claim to go to the jury to determine whether Five Star acted in bad faith. *See Tractebel*, 487 F.3d at 98 ("[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact.") (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)).

## CONCLUSION

For all of the foregoing reasons, Design Partners' summary judgment motion is denied, and Five Star's summary judgment motion is granted as to Count 3 and denied in all other respects. In addition, Five Star is hereby directed to show cause within 21 days of the date of this opinion as to why summary judgment should not be granted to Design Partners on Count 5 for breach of the Training Contract in the sum of $8,000 and on Count 6 for breach of the non-solicitation provision of the MSA as to Wyllie. *See* Fed. R. Civ. P. 56(f).

This case will proceed to trial on Counts 1 (breach of contract), 2 (account stated), 4 (intentional interference with contract), Design Partners' newly-added claim of breach of implied covenant and fair dealing as to the Consulting Agreement, and Five Star's Counterclaim for breach of contract. Design Partners will also be permitted to seek additional damages on Count 5 based on the depreciated value of its laptops that were used by Five Start as part of the Training Contract.

SO ORDERED:

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 29, 2016
       Brooklyn, New York